IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

R.C. by and through his parents, C.K. and S.C.,  :
and C.K. and S.C. in their individual capacities,  :
of Horsham, Pennsylvania.  :
   :  Civil Action
       Plaintiffs  :
v.  :  No.
   :
HATBORO-HORSHAM SCHOOL DISTRICT  :
229 Meetinghouse Road  :
Horsham, Pennsylvania 19044  :
   :
       Defendant  :

## **COMPLAINT**

## I.    **Introduction**

1.    This matter is an appeal from a Pennsylvania special education administrative due process hearing.

2.    Plaintiff R.C. is a minor child with disabilities whose parents, C.K. and S.C. (collectively "Parents"), emigrated to the United States from India in the summer of 2022, when R.C.'s father's employer transferred him to the United States. They arrived with little to no understanding of the complexities of the special education system in the United States. They enrolled their son in school in the Defendant Hatboro-Horsham School District ("School District"), but, as the Hearing Officer found, the School District failed to offer him a Free and Appropriate Public Education during the 2022-2023 school year.

3.    The Parents filed an administrative due process complaint against the School District for tuition reimbursement at a private school pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, and Section 504 of the Rehabilitation Act of

1973, 29 U.S.C. § 794 ("Section 504"), and those statutes federal and state implementing regulations.

4.      R.C. attended the AIM Academy ("AIM"), a private school located at 1200 River Road Conshohocken, Pennsylvania 19428, from the beginning of the 2022-2023 school year until present.

5.      The Hearing Officer ruled in favor of Plaintiffs R.C., C.K., and S.C. (collectively, "the Family"), finding that the School District failed to offer R.C. a FAPE during the 2022-2023 school year, AIM was an appropriate placement for R.C., and the equities favored the Family in awarding tuition at AIM for the 2022-2023 school year.

6.      Therefore, the Family is considered the prevailing party under IDEA and Section 504 and entitled to an award of attorney's fees and costs.

7.      However, the Hearing Officer erred by failing to award tuition reimbursement to the Family for the 2023-2024 school year.

8.      The Hearing Officer erroneously held that the School District offered R.C. a FAPE in August of 2023.

9.      The Parents timely provided 10-days of notice to the School District of their request for private school funding; this notice was sufficient for the District to draft an IEP and hold an IEP meeting. However, the Hearing Officer below ignored the applicable statutes, regulations and case law and erroneously held that the Parents should have provided more than the required 10-days of notice and used that holding to deny the Parents tuition reimbursement for the 2023-2024 school year.

10.     The Family brings this appeal under IDEA, Section 504, the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101, *et seq.*; and the federal and state

implementing-regulations of the foregoing statutes, and respectfully requests that the Court (1) affirm the award of tuition reimbursement for the 2022-2023 school year; (2) reverse the denial of tuition reimbursement for the 2023-2024 school year; (3) declare that AIM Academy is R.C.'s pendent placement during this litigation; and (4) award reasonable attorney's fees and costs to the Family as the prevailing party and any other relief this Court deems just.

## II.    Parties

11.    R.C. was born in 2009 and at all relevant times resided with his Parents and within the geographical boundaries of the Defendant School District and the Eastern District of Pennsylvania.

12.    R.C. is a student with a disability as defined under IDEA, with a disability classification of Specific Learning Disability, and is a Protected Handicapped Student under Section 504 and the ADA.

13.    The District is located at 229 Meetinghouse Road Horsham, Pennsylvania 19044. It is the recipient of several sources of federal funds and is an educational agency designated by Pennsylvania law and the Pennsylvania Department of Education for the provision of educational services to individuals residing within its boundaries including those mandated under IDEA and Pennsylvania's statutory/regulatory scheme concerning children with disabilities.

## III.    Jurisdiction and Venue

14.    This Court has original jurisdiction over this appeal pursuant to 28 U.S.C. § 1331 because it raises federal questions under the IDEA, Section 504, and the ADA.

15.    Plaintiffs have exhausted their administrative remedies where required under IDEA (20 U.S.C. § 1415(i)) and Section 504, having timely pursued a Special Education Due Process

hearing.

16.     The ADA does not require the exhaustion of administrative remedies, and in Pennsylvania, the Department of Education does not permit parents to raise administrative claims under the ADA alongside an IDEA and Section 504 claim; thus, the Plaintiff's state due process complaint only concerned IDEA and Section 504. The ADA claims are appropriately raised for the first time to this Court.

17.     Plaintiffs' claims and remedies are authorized by 20 U.S.C. § 1415 and 28 U.S.C. §§ 2201 and 2202, providing for declaratory and any further relief deemed necessary and proper.

18.     All of the Defendant's actions have taken place within the jurisdiction of the United States District Court for the Eastern District of Pennsylvania. Venue is appropriate in this judicial district pursuant to 28 U.S.C. § 1391.

## IV.   <u>Applicable Law</u>

### A.     IDEA requires that a school district identify and evaluate all children with disabilities who live in the district and offer such students a Free Appropriate Public Education through an IEP.

19.     The purpose of the IDEA is to ensure that "all children with disabilities have available to them a free appropriate public education ("FAPE") that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A).

20.     At the beginning of each school year, a school district is required to develop an IEP that provides a FAPE for each child with a disability who resides within its jurisdiction. 20 U.S.C. § 1414(d)(2)(A).

21.     Because a school district's obligation to offer FAPE derives from the child's

residency in the community, even disabled students in private schools must be offered an IEP, and enrollment is not required to trigger the mandatory obligation to provide an offer of FAPE. *Shane T. v. Carbondale Area School District*, 2017 WL 4314555 at *9 (E.D. Pa. February 24, 2020); *see also I.H. v. Cumberland Valley School Dist.*, 842 F. Supp.2d 762, 772-73 (E.D. Pa. 2012) ("requiring enrollment as a prerequisite to obtaining an IEP . . . would be at odds with the 'remedial nature' of the IDEA").

22.     A resident child eligible for special education services is entitled to an offer of FAPE upon parent's request. *L.T. v. North Penn School District*, 2018 WL 6600206 at *7 (E.D.Pa. December 14, 2018). If that resident child is attending a privately-funded program, the child still has the right to an offer of a FAPE via a thorough evaluation and a proposed IEP. *Shane T.*, *supra*, 2017 WL 4314555 at *9.

23.     A two-pronged analysis applies in reviewing a school district's IEP development under the IDEA: (1) whether the District complied with the procedures set forth in the IDEA; and (2) whether the IEP developed through the IDEA's procedures is reasonably calculated to enable the child to receive meaningful educational benefit.  *Board of Educ. v. Rowley*, 458 U.S. 176, 206-07, 102 S .Ct. 3034 (1982); *see also Endrew F. v. Douglas County School District RE-1*, 580 U.S. 386, 137 S. Ct. 988, 999 (2017).

24.     The United States Supreme Court in its decision in *Endrew F.*, emphasized that IDEA requires more than a program reasonably calculated to allow a student to make "some progress." *Endrew F.*, 137 S. Ct. at 997, 1000-01. Instead, IDEA "requires an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Id.* at 999.

25.     In addition, an "educational program must be appropriately ambitious in light of

his circumstances," as minimal "progress from year to year can hardly be said to have been offered an education at all. The goals may differ, but every child should have the chance to meet challenging objectives." *Id.* at 999-1000.

26.     Furthermore, it is well-settled that "education" extends beyond discrete academic skill, and includes the social, emotional, behavioral, and physical progress necessary to move the child toward meaningful independence and self-sufficiency consistent with the child's cognitive potential. *M.C. v. Central Regional School District*, 81 F.3d 389, 393-94 (3d Cir. 1996); *see also Polk v. Central Susquehanna Intermediate Unit 16*, 853 F.2d 171, 181-82 (3d Cir. 1988).

**B.     A school district is required to reimburse a parent for private school tuition where the district failed to offer an appropriate IEP and where the private school placement was appropriate.**

27.     The Supreme Court established that when a school district's IEP is inappropriate, and when the parents obtain and pay for an appropriate private school program along with other equitable considerations, the school district must fund the private program provided by the child's parents. *School Comm. of Burlington v. Dept. of Educ. of Massachusetts*, 471 U.S. 359, 370-71, 105 S.Ct. 1996 (1985); *see also Florence County School Dist. v. Carter*, 510 U.S. 7, 14, 114 S.Ct. 361 (1993); 34 C.F.R. § 300.148(c).

28.     As such, under IDEA, parents who disagree with their child's program and placement at a school district may unilaterally enroll their child in an appropriate out-of-district placement and obtain tuition reimbursement where a court determines that the school district has not offered an appropriate education to the child. *Shore Reg'l High School Bd. of Educ. v. P.S.*, 381 F.3d 194, 198-99 (3d Cir. 2004).

29.     Under the test for tuition reimbursement from *Burlington*, *supra*, a court's first step is to determine whether the school district offered the student FAPE through an appropriate IEP.

*Burlington*, 471 U.S. at 369-70.

30.    Tuition reimbursement for a family's unilateral decision to place a child in a private placement is appropriate if "the [school district] has not made free appropriate education available to the child in a timely manner prior to that enrollment." *Norristown Area School District v. F.C.*, 636 F. App'x. 857 (3d Cir. 2016).

31.    After examining the written IEP, the court must determine whether the private school was appropriate. *Burlington*, 471 U.S. at 369-70.

32.    Once a court determines a placement is appropriate, the court may still reduce the tuition reimbursement if the court finds that an equitable reduction is necessary after examining (1) whether the parents informed the school district of their intent to remove the student, (2) whether the parents made their child unavailable for a reevaluation, or (3) whether the parents otherwise acted unreasonably. 34 C.F.R. § 300.148(d).

**C.    A student may also bring a tuition reimbursement claim under Section 504 and the ADA.**

33.    Court apply the de novo standard of review to claims raised under Section 504 and the ADA. *Le Pape v. Lower Merion*, --- F. 4th ---, 2024 WL 2822917 at *12 (3d Cir. 2024).

34.    Under Section 504, recipients of federal funds such as the District are required to "provide a free appropriate public education [FAPE] to each qualified handicapped person who is in the recipient's jurisdiction, regardless of the nature or severity of the person's handicap." 34 C.F.R. § 104.33(a).

35.    Section 504 requires that "a public elementary or secondary education program shall annually undertake to identify and locate every qualified handicapped person residing in the recipient's jurisdiction who is not receiving a public education and take appropriate steps to notify

handicapped persons and their parents or guardians of the recipient's duty under this subpart." 34 C.F.R. § 104.32; *see also Ridgewood Bd. of Educ. v. N.E.*, 172 F.3d 238, 253 (3d Cir. 1999).

36.     "When a state fails to provide a disabled child with a free and appropriate education, it violates the IDEA.  However, it also violates [Section 504] because it is denying a disabled child a guaranteed education merely because of the child's disability. It is the denial of an education that is guaranteed to all children that forms the basis of the claim." *Andrew M. v. Delaware Cty. Office of Mental Health and Mental Retardation*, 490 F.3d 337, 350 (3d Cir. 2007).

37.     Thus, the substantive requirements of Section 504 in the education context are largely, but not entirely, equivalent to the requirements under the IDEA. *James S. v. School Dist. of Phila.*, 559 F. Supp.2d 600, 620 (E.D. Pa. 2008).

38.     A school may violate Section 504 independent of any violations of IDEA. *See Lauren G. v. West Chester Area School Dist.*, 906 F.Supp.2d 375 (E.D. Pa. 2012) (granting tuition reimbursement for school district's failure to provide FAPE under Section 504 during period for which no relief was granted under IDEA).

39.     To establish a violation of Section 504, a plaintiff must prove that: (1) he is "disabled" as defined by the Act; (2) he is "otherwise qualified" to participate in school activities; (3) the school or the board of education receives federal financial assistance; and (4) he was excluded from participation in, denied the benefits of, or subject to discrimination at, the school. *Ridgewood*, 172 F.3d at 253.

40.     Tuition reimbursement is an available remedy under Section 504, as well as under IDEA. *Molly L. v. Lower Merion School Dist.*, 194 F.Supp.2d 422, 429 n.7 (E.D. Pa. 2002) ("Tuition reimbursement has been awarded in cases arising under both the Rehabilitation Act and IDEA.").

41.     The ADA provides, in relevant part, that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The Third Circuit has held that the ADA "extends the nondiscrimination rule of [Section 504] to services provided by any 'public entity' (without regard to whether the entity is a recipient of federal funds)." *Jeremy H. v. Mount Lebanon School Dist.*, 95 F.3d 272, 279 (3d Cir. 1996). That court held that "the remedies, procedures, and rights" applicable to Section 504 claims are the same as those under the ADA. *Id.*; *see also Terence D. v. School Dist. of Philadelphia*, 548 F. Supp. 2d 162, 169-70 (E.D. Pa. 2008) (applying same analysis to claims under ADA as to claims under Section 504).

42.     The IDEA, Section 504, and the ADA all permit the recovery of reasonable attorneys' fees and costs by parents who prevail in an action or proceeding thereunder. 20 U.S.C. § 1415; 42 U.S.C. § 12205; 34 C.F.R. § 300.517; 29 U.S.C. § 794a.

**D.      R.C.'s pendent placement is AIM pending the outcome of this litigation.**

43.     A student with a disability has the right to remain in his then-current educational placement during the pendency of a dispute over a revision to his program/placement. 20 U.S.C. § 1415(j). This is known as the student's "pendent placement."

44.     Specifically, 34 C.F.R. § 300.518(a) provides that "during the pendency of any administrative or judicial proceedings regarding a due process complaint . . . unless the State or local agency and the parents of the child agree otherwise, the child involved in the complaint must remain in his or her current educational placement." 34 C.F.R. 300.518(a); 20 U.S.C. § 1415(j); *Susquenita Sch. Dist. v. Raelee S. by and through Heidi S.*, 96 F.3d 78, 83 (3d Cir 1996).

45.     The Third Circuit has held that that the payment of tuition during the pendency of

the dispute it was the "unavoidable consequence of the balance Congress struck to ensure stability for a vulnerable group of children." *M.R. v. Ridley Sch. Dist.*, 744 F.3d 112, 128 (3d Cir. 2014).

46.     Section 1415(j) of the IDEA functions, in essence, as an automatic preliminary injunction. *Zvi D. v. Ambach*, 694 F.2d 904, 906 (2d Cir. 1982). As the Second Circuit has explained, "[t]he statute substitutes an absolute rule in favor of the status quo for the court's discretionary consideration of the factors of irreparable harm and either a likelihood of success on the merits or a fair ground for litigation and a balance of hardships." *Id.* (citations omitted). "[I]mplicit in the maintenance of the status quo is the requirement that a school district continue to finance an educational placement made by the agency and consented to by the parent before the parent requested a due process hearing. To cut off public funds would amount to a unilateral change in placement, prohibited by the Act." *Id.* at 906.

## V.     Factual History

47.     Plaintiffs incorporate by reference the preceding paragraphs.

48.     R.C. has been identified as eligible for special education pursuant to the IDEA and Section 504, as a student with a Specific Learning Disability.

49.     The Family resided in a different country until June of 2022 when one of the Parents was transferred for work to the United States. Pennsylvania Special Education Due Process Hearing Officer Final Order and Decision, 5/15/24 (hereinafter, "Decision")..

50.     While attending school in the other country, the Parents became concerned with R.C.'s reading skills and obtained private evaluations that showed deficits in reading, spelling, handwriting, and mathematics skills. An evaluator also suggested that R.C.'s weaknesses were suggestive of dyslexia. *Id.*

51.     A different psychologist conducted an evaluation of R.C. in September 2021 and

concluded that R.C. had a learning disability. *Id.*

52.     When the Parents learned of the transfer to the United States, they began to investigate private schools, as education at a private school is customary in their home country. *Id.* at 4, 6.

53.     They decided on AIM and enrolled R.C. there in June of 2022. *Id.* at 6.

54.     Concurrently, they registered R.C. in the School District. *Id.*

55.     In response to R.C.'s registration, the District convened a meeting and issued a Permission to Evaluate form, and the Parents consented to the evaluation. *Id.*

56.     The District's Evaluation Report (ER) was not issued for several months and was only promulgated in early December of 2022, long after R.C. had already started at AIM in September 2022.

57.     Parent input into the ER reflected concerns with reading, spelling, self-confidence, and social skills. The Parents also reported that R.C. had a fear of learning with typical peers who were performing at grade level. At home, R.C. required reminders to complete homework and support for planning tasks. *Id.*

58.     Assessment of cognitive ability for the ER revealed a Full Scale IQ in the average range. *Id.* at 7.

59.     Academic assessment for the ER yielded below average skills in Word Reading, but average range scores in Pseudoword Decoding, Reading Comprehension, and Listening Comprehension.   An additional reading measure identified a number of areas of deficit: phonological processing, decoding, overall fluency, comprehension, spelling, essay composition, math problem solving, and numerical operations. *Id.*

60.     The occupational therapy assessment reflected a weakness in visual motor and

visual perceptual functioning, with a recommendation for direct services bi-monthly to better develop those skills. *Id*. at 8.

61.     Recommendations in the ER were for direct systematic instruction in a phonemic reading program; highly structured instruction in written expression; support for reading activities; support for written expression; support for mathematics including use of manipulatives; assignment accommodations; and occupational therapy. *Id*.

62.     The ER also recommended informal monitoring of self-advocacy and withdrawal behaviors in light of R.C.'s recent transition to this country and a new school. *Id*.

63.     The School District issued an IEP in early December 2022. *Id*.

64.     The Hearing Officer found that the IEP the District offered did not offer R.C. a FAPE in December 2022 in-part because the annual goals were deficient. The IEP addressed reading decoding with no targeted level of expectation; encoding with no level of expectation; and solving multiplication and division problems, however, the District failed to include the critical grade level multiplication and division problems. None of the goals contained essential baselines as required to measure and to report progress. *Id*. at 9.

65.     In addition, the School District failed to include a transition plan in his IEP to allow him to transition to learning in a new country. *Id*.

66.     The December 2022 IEP provided for learning support at a supplemental level, with R.C. participating in regular education classes except for basic reading and written expression instruction, occupational therapy, and learning support during student support periods. *Id*. at 10.

67.     The District proposed that R.C. have special education support (through direct and consultative services) in regular education for social studies, science, and mathematics; English/Language Arts class would occur in the learning support classroom with approximately

15 total students, two teachers, and a paraprofessional. Mathematics, science, and social studies were to be co-taught by a general education teacher and a special education teacher. *Id*.

68.     During the IEP meeting, the Parents voiced concerns about R.C. making another transition if he would begin to attend school in the District, as well as his discomfort in regular education classes with typical peers performing at grade level. *Id*. at 9.

69.     Several days after the December 2022 IEP meeting, AIM updated the Parents on R.C.'s reading, writing, social, and behavioral strengths and needs.

70.     In reading, R.C. needed to increase fluency, self-correct decoding errors, and challenge himself in processing text; in writing, he required prompts and guidance through those tasks. At AIM, R.C. benefited significantly from multisensory presentations, modeling, positive reinforcement, Socratic questioning, visual checklists and images, and writing prompts. *Id*. at 11.

71.     During the December IEP meeting, the District discussed only the Lexia Reading program, which is a partly computer-based program, which the Family understood would be implemented twice per week for 25 minutes per session. (N.T. 1/10/24, 59). There was no other reading program discussed with the Family at the IEP meeting. *Id*.

72.     The District testified that it would implement the Lexia program during his ELA class in addition to the Wilson Reading program. *Id*. at 106-07, 111-12; N.T. 2/8/24, 277-78. This information was not provided to the family during either IEP meeting, and it nonetheless failed to address the R.C.'s needs regarding reading. N.T. 1/10/24, 59, 71-72. Specifically, the December 2022 IEP provides only for additional reading instruction in a small group two times per week for 25 minutes each session. Exh. P-7 at 26. However, for Wilson to be effective when administered in a small group—consistent with the research supporting the program and per its own guidance— Wilson should be implemented a minimum of four to five times per week for 45 to 60 minutes,

which was what AIM was doing. *See*, *e.g.*, https://www.wilsonlanguage.com/programs/wilson-reading-system/implementation/; N.T. 1/10/24, 181.

73.    Additionally, although the District's special education teacher would have been tasked with implementing the Wilson Reading program, she was not certified in Wilson. N.T. 1/10/24, 112-13. According to the Wilson Reading program, she is not qualified to implement it.

74.    While the IEP included goals in phonemics and word analysis, written expression, and mathematics, there were no goals related to R.C.'s difficulty with transitioning/change, anxiety, feelings of being overwhelmed in the educational environment, nor were there any goals related to occupational therapy, an additional area of need identified by the District. Exh. P-7 at 21-25.

75.    The Specially Designed Instruction ("SDI") section of the IEP also fails to include any necessary social-emotional supports or services. *Id*. at 26-27. Nor does it include any support for the proposed transition from a small private school to a large public middle school mid-year. *Id*.

76.    Additional Parent input after the December 2022 IEP meeting noted that R.C. was anxious when around new people and sometimes hyperactive. Decision, 11.

77.    Parents signed an agreement with AIM in February 2023 as required to hold his place for the 2023-2024 school year. *Id*.

78.    Having just moved to the United States, the Parents were almost completely unaware of R.C.'s rights under federal law to an appropriate education. N.T. 1/10/24, 65-66. However, as they came to know families attending AIM, they began to better understand their rights, including their right to tuition reimbursement when, as here, a school district fails to offer a child FAPE.

79.     The Parents contacted the District in August of 2023 to request funding for AIM for the 2023-2024 school year. Decision, 11-12.

80.     The Parents timely gave 10-days of notice to the School District of their request for funding at AIM for the 2023-2024 school year. *Id*. at 24.

81.     The notice that the Parents provided fully complied with IDEA's explicit notice requirement. 20 U.S.C. § 1412(a)(10)(C)(iii)(I)(bb).

82.     The Parents provided fully sufficient notice for the School District to offer an IEP and hold an IEP meeting prior to the school year.

83.     An IEP meeting was held in August of 2023, in which the Parents expressed that R.C. should remain at AIM where he feels no different from his peers and everyone in the class is provided the same instruction. They also discussed the Parents' concerns with general education classes; the likelihood that R.C. would feel different from peers and awkward in that setting; and the need for small group learning support for English/Language Arts and Mathematics. *Id*. at 12.

84.     The same reading program that was proposed in the December 2022 IEP would continue during English/Language Arts in learning support. However, the IEP team did not discuss the specific reading program it proposed for the 2023-24 school year at the meeting. Decision, 13.

85.     The Parents again voiced concerns at the August 2023 IEP meeting about Student making another transition if Student would begin to attend school in the District. They also shared concerns about Student being in classes where peers would have varying abilities. *Id*.

86.     AIM is a college-preparatory school for students in grades one through 12, located in Conshohocken, Pennsylvania. *Id*. at 14.

87.     AIM has a total enrollment of 409 students with a student to teacher ratio of eight to one. *Id*.

88.     AIM has a core curriculum that is aligned with common core state standards for all subjects. *Id*.

89.     The academic programming at AIM, moreover, is individualized, evidence-based, and innovative, and assists students in developing deep understanding and critical thinking skills. N.T. 1/10/24, 176-77. Students are immersed in a highly interactive, language-enriched learning environment, blending hands-on, arts- and evidence-based research and Wilson Reading teaching methods. *Id*. AIM teachers draw from an array of proven technologies to help each of their students thrive. *Id*.

90.     R.C. specifically receives daily ELA instruction for approximately one hour; daily Wilson Reading instruction for approximately one hour; daily math instruction for approximately one hour; daily science instruction for approximately one hour; and daily social studies instruction for approximately one hour. *Id*. at 181-82. All of his teachers are certified in the subject matter for which they instruct, many of whom are also certified special education teachers. *Id*. at 183-85.

91.     Both his ELA teacher and Wilson Reading teacher are Wilson certified, and his Wilson teacher has both Level I and Level II certification. *Id*. He also participates in advisory period each morning where executive functioning and social-emotional skills are addressed, as well as providing R.C. with an opportunity for a check-in period. *Id*. at 186-90. He also has a daily elective class period each day. *Id*. at 186.

92.     Progress reporting by AIM over the 2022-23 school year reflected growth in skills and academic content across subject areas. R.C. attained A to B grades each quarter and as final grades. Decision, 15.

93.     R.C. is flourishing at AIM as reflected by his progress and grades in his report cards and progress reports, as well as in his testing and monitoring. N.T. 1/10/24, 194-13; Exh. P-11

through P-15.

94.     He is rebuilding his self-image and self-confidence and making great academic strides. *Id*. AIM staff believe R.C. has been making appropriate progress while at AIM, and that his academics and social-emotional needs are being met. *Id*. The size of the school and R.C.'s classes have contributed to his success at AIM. N.T. 1/10/24, 192-94.

95.     Progress reporting by AIM for the first quarter of the 2023-24 school year reflects that R.C. adjusted to the new year and continued to exhibit growth in skills and academic content across subject areas. Decision, 15.

96.     During the fall of the 2023-24 school year, the Parents filed a Due Process Complaint under the IDEA and Section 504, contending that the District did not propose appropriate programs for R.C. for the 2022-23 and 2023-24 school years.

97.     The Hearing Officer held that the District denied R.C. a FAPE during the 2022-23 school year and AIM Academy was an appropriate placement for R.C., and thus ordered tuition reimbursement for that school year.

98.     However, the Hearing Officer denied tuition reimbursement for the 2023-2024 school year, holding that District offered him a FAPE prior to the start of the 2023-2024 school year.

## VI.     **The Hearing Officer's Errors**

99.     The Plaintiff incorporates by reference the preceding paragraphs.

100.     The Hearing Officer erred by holding that the District offered R.C. a FAPE for the 2023-2024 school year.

101.     The Hearing Officer erred by holding that the Parents should have requested tuition reimbursement for the 2023-2024 school year before of its timely notice in August 2023.

102.     The Parents were new to the United States and the School District did not educate

them on their rights under IDEA or Section 504, aside from offering the boilerplate, voluminous

Procedural Safeguards packet.

103.     Once the Parents understood that they could request funding for a private school,

they immediately requested it.

104.     The Parents' request for funding was timely enough for the District hold an IEP

meeting and offer an IEP for the 2023-2024 school year.

105.     Indeed, the Hearing Officer found that the Parents gave adequate notice to the

School District of their request for funding for private school tuition.

106.     The Parents provided the statutorily required 10 days of notice when they requested

funding for private school tuition.

107.     Clearly, the School District understood the Parents' request for funding at AIM as

a request for an IEP and offer of FAPE; otherwise, the District would not have drafted an IEP and

held an IEP meeting so quickly.

108.     The Hearing Officer erred by holding that the Parents needed to provide more

notice than the statutorily required 10 days of notice; the Hearing Officer's error—her decision to

hold the Parents to a higher standard than the 10 days of notice—was particularly egregious

considering the Parents were still relatively new to the United States and could not be expected to

understand the special education system as well as a parent who has resided in the United States

their entire lives.

109.     The Hearing Officer erred by holding that the Parents failed to request an IEP or

evaluation before the 2023-2024 school year.

110.     The Hearing Officer's conclusion is tantamount to a "magic words" requirement,

in that the Hearing Officer required these newly immigrated Parents to specify that they not only wanted private school tuition but also "an offer of FAPE."

111.   The Hearing Officer erred by holding that the Parents' request for funding did not trigger the District's obligation to offer an IEP.

112.   The August 2023 IEP was very similar to the inadequate December 2022 IEP and likewise failed to offer R.C. a FAPE.

113.   The August 2023 IEP failed to provide R.C. with an educational program that allowed him to make meaningful educational progress.

114.   The most concerning deficiency in the August 2023 IEP is in R.C.'s reading instruction.  As R.C.'s father explained during his testimony, the only reading program discussed during either the initial December 2022 IEP meeting or the August 2023 revision meeting was the Lexia reading program, which is—at least in part—a computer-based reading instruction program.

115.   The Hearing Officer erred by focusing her analysis on the Parents' supposed request for a specific reading program. R.C. is entitled to an appropriate program, and a computer-based program is not appropriate for R.C.

116.   The Hearing Officer erred by holding that the School District's offer of FAPE was "reasonable" given the District's "short time frame" to develop an IEP.

117.   The Parents provided legally sufficient notice to the District, as the Hearing Officer found, and the District had comprehensively evaluated R.C. only eight months prior to offering the August 2023 IEP.

118.   Thus, the Hearing Officer erred by excusing the District's inadequate IEP based upon an allegedly tight but legally sufficient timeline.

119.   The Hearing Officer erred by holding that there are equitable reasons to reduce a

tuition reimbursement award for the 2023-2024 school year.

120.     The Hearing Officer erred by speculating as to the Family's "objective intention to maintain" R.C. at AIM.

121.     In a tuition reimbursement analysis, a court must analyze the facts objectively, and not speculate as to a parent's subjective intentions.

122.     In any event, the Hearing Officer found that the Parents provided statutorily timely notice of their request for funding for the private school.

123.     The Parents only recently arrived in the United States, it is not equitable to hold them to a standard beyond the statutorily required 10-days of notice, which is what the Hearing Officer improperly did here.

124.     The Family fully participated in the IEP meetings in August of 2023.

125.     Because the Family met the third prong of the tuition reimbursement analysis, there is no equitable basis to reduce or deny tuition reimbursement.

126.     The District's failure to offer R.C. a non-discriminatory, appropriate educational environment resulted in him being excluded from participation in, denied the benefits of, or subject to discrimination in, his education in violation of not only IDEA, but Section 504 and the ADA as well.

127.     The Hearing Officer therefore erred in not awarding tuition reimbursement under not only IDEA, but Section 504 and the ADA as well.

**WHEREFORE**, the Plaintiffs respectfully request that this Court:

1.     Assume jurisdiction over this action;

2.     Hear additional evidence pursuant to 20 U.S.C. § 1415(i)(2)(C)(ii);

3.      Declare that R.C.'s placement at AIM is his pendent placement pursuant to 20 U.S.C. § 1415(j) and 34 C.F.R. 300.518(a);

4.      Reverse the Hearing Panel's Decision and award the Family tuition reimbursement and related costs for 2023-2024 school year AIM;

5.      Declare that the Plaintiffs are the prevailing party and order the Defendant to pay Plaintiffs their reasonable attorneys' fees and related costs;

6.      Declare the Defendant's actions and omissions to be violative of IDEA, Section 504, ADA; and Pennsylvania law; and

7.      Grant such other relief as this Court deems proper.


                        Respectfully submitted,

                        /s/*Dennis C. McAndrews*
                        Dennis C. McAndrews, Esquire
                        ID No. 28012

                        /s/ *Michael J. Connolly*
                        Michael J. Connolly, Esquire
                        ID No. 82065

                        /s/ *D. Daniel Woody*
                        D. Daniel Woody, Esquire
                        ID No. 309121

                        McANDREWS, MEHALICK, CONNOLLY,
                        HULSE and RYAN, P.C.
                        30 Cassatt Avenue
                        Berwyn, Pennsylvania 19312
                        Tele: 610-648-9300
                        Attorneys for the Family